**John CEKO, Plaintiff,**

v.

**Leroy MARTIN, Superintendent of Police, Hubert W. Holton, Director of Personnel, Steven Stanard, Ph.D., and The City of Chicago, a Municipal Corporation, Defendants.**

No. 90 C 4172.

United States District Court,
N.D. Illinois, E.D.

Dec. 27, 1990.

Thomas J. Pleines, Law Offices of Joseph V. Roddy, Chicago, Ill., for plaintiff.

Kelly R. Welsh, Corp. Counsel of the City of Chicago by Patricia M. Carroll–Smit, Asst. Corp. Counsel, Chicago, Ill., for defendants Martin, Holton and City of Chicago.

## MEMORANDUM ORDER

BUA, District Judge.

Plaintiff, a long-time employee of the Chicago Police Department (the "Police Department"), commenced this lawsuit after the Police Department placed him on an unpaid medical leave of absence. Plaintiff contends that he was not afforded due process before he was placed on sick leave. Three of the named defendants have moved to dismiss plaintiff's two-count complaint. For the reasons stated herein, defendants' motion to dismiss is denied with respect to

Count I and granted with respect to Count II.

## I. FACTS

Over the course of his employment with the Police Department, plaintiff John Ceko experienced periods of emotional and psychological instability. Despite this history of "emotional disarray" (as characterized by his treating physician), Ceko began serving as a "911" emergency dispatcher on May 1, 1989.

On October 24, 1989, only five months after he started his new position, Ceko was hospitalized for treatment of a psychological disorder. Unable to continue working, Ceko was placed on the Police Department's "medical rolls." Ceko's employee benefits provided for paid sick leave; thus, he continued to receive his full salary while on the medical rolls. On November 9, 1989, however, Ceko's leave status was altered to "excused with no pay" for medical reasons. Later that month, Dr. Dixon Spivy (Ceko's treating physician) advised the Police Department that Ceko was medically fit to return to work as of December 8, 1989. Ceko also notified the Police Department that he was able to resume his duties as a 911 dispatcher on the date recommended by his doctor.

On December 11, 1989, the Director of Personnel for the Police Department, Hu-

bert Holton, asked Ceko to submit to a physical examination by Dr. Steven Stanard. Ceko agreed to the examination. Dr. Stanard administered several tests, and issued his report on January 10, 1990. Based on his medical findings, Dr. Stanard concluded that Ceko was psychologically unfit to resume his previous duties as a 911 dispatcher, but that Ceko could return to work in a clerical position. On January 26, 1990, Dr. Spivy again informed the Police Department that Ceko was physically able to assume the duties of a 911 dispatcher— provided, however, that Ceko takes medication and maintains regular doctor appointments. The Police Department never responded to Dr. Spivy's January 26 letter.

In a letter dated May 9, 1990, Holton informed Ceko that the Police Department had placed him on a one-year involuntary leave of absence. Holton stated that the leave of absence took effect on May 7, 1990. Shortly after being placed on involuntary leave of absence, Ceko filed this lawsuit against Holton, Dr. Stanard, Police Superintendent LeRoy Martin, and the City of Chicago.[1] Ceko contends that defendants violated his constitutional right to due process by failing to provide an opportunity to contest the Police Department's decision to place him on unpaid sick leave.[2] Defendants Holton, Martin, and

**1.** Ceko apparently is suing defendants Holton and Martin in their official capacities, though it is not entirely clear from the face of the complaint. Ceko never actually uses the terms "official capacity" or "individual capacity." Ceko does, however, identify defendants' job titles in the caption, which suggests that he is suing them in their official capacities. *See Kolar v. County of Sangamon,* 756 F.2d 564, 568 (7th Cir.1985). The complaint, moreover, refers to the responsibilities of Holton and Martin with respect to the "policies" and "practices" of the Police Department. *Verified Complaint,* ¶¶ 3, 4. As both sides appear to be in agreement that Holton and Martin are sued in their official capacities only, Ceko's claims against Holton and Martin shall be treated as official capacity claims.

**2.** Ceko asserts his constitutional challenge pursuant to 42 U.S.C. § 1983. When suing a municipality (or a public official acting in his official capacity) under § 1983, the plaintiff must allege that his injury was the product of an official policy, custom, or practice. *Monell v.*

*Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). In moving to dismiss Ceko's complaint, defendants initially argue that Ceko has failed to allege an unlawful municipal policy. Defendants also contend that Holton and Martin do not have the "final policymaking authority" necessary to subject the City to § 1983 liability. Neither argument, however, warrants serious consideration. Ceko's cause of action stems from the City's involuntary leave of absence policy, which Ceko claims is unconstitutional. Since Ceko alleges that his injury resulted from an unconstitutional municipal policy, he may sue the municipal entity as well as the municipal officials who acted pursuant to that municipal policy—*i.e.,* Holton and Martin. *See id.* at 690 n. 55, 98 S.Ct. at 2035 n. 55; *Dunton v. County of Suffolk,* 729 F.2d 903, 907 (2d Cir.1984). Consequently, Ceko is not required to allege that Holton and Martin possessed final policymaking authority. Such an allegation would be necessary only if Ceko was seeking to hold the municipality liable for the unauthorized, isolated conduct of a mu-

the City now seek dismissal of Ceko's complaint.

## II. DISCUSSION

In order to maintain a due process claim, Ceko must demonstrate that defendants deprived him of a constitutionally-protected property or liberty interest. *Bishop v. Wood,* 426 U.S. 341, 343, 96 S.Ct. 2074, 2076, 48 L.Ed.2d 684 (1976); *Brown v. City of Lake Geneva,* 919 F.2d 1299, 1303 (7th Cir.1990). Ceko asserts a deprivation of both a property interest and a liberty interest. Ceko alleges, in Count I of his complaint, that he was deprived of his property interest in continued employment, as well as the attendant benefits of such employment. Count II alleges a deprivation of a liberty interest in his "good name and employment prospects." The court will now consider each claim separately.[3]

### A. Count I—Property Interest

It is well established that an individual cannot assert a property interest in a benefit unless he has a "legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Lohorn v. Michal,* 913 F.2d 327, 335 (7th Cir.1990). Property interests do not arise from the Constitution; rather, they emanate from sources outside of the Constitution, such as state law. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709; *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1479 (7th Cir.1990).

Ceko contends that he has a property interest "in his continued employment, his salary and the benefits of his employment such as medical insurance, seniority and pension benefits." *Verified Complaint,* ¶ 17. According to Ceko, this prop-

erty interest is created by Ill.Rev.Stat. ch. 24, para. 10–1–18.1 (1989), which provides in part:

> In any municipality of more than 500,-000 population, no officer or employee of the police department in the classified civil service of the municipality whose appointment has become complete may be removed or discharged, or suspended for more than 30 days except for cause upon written charges and after an opportunity to be heard in his own defense by the Police Board....
>
> Upon the filing of charges for which removal or discharge, or suspension of more than 30 days is recommended a hearing before the Police Board shall be held.
>
> ....
>
> Nothing in this Section limits the power of the superintendent to suspend a subordinate for a reasonable period, not exceeding 30 days.

This statute, which permits a discharge or long-term suspension only when there is cause for the dismissal, creates a property interest in continued employment. *Confederation of Police v. City of Chicago,* 547 F.2d 375, 376 (7th Cir.), *cert. denied,* 431 U.S. 915, 97 S.Ct. 2175, 53 L.Ed.2d 224 (1977); *D'Acquisto v. Washington,* 640 F.Supp. 594, 607 (N.D.Ill.1986). Defendants do not dispute that Police Department employees such as Ceko have a property interest in continued employment by virtue of paragraph 10–1–18.1. Nonetheless, defendants contend that paragraph 10–1–18.1 is inapplicable because Ceko was never actually discharged or suspended by the Police Department. While it is true that Ceko was not removed from employment in the strict sense of the term, he was effectively deprived of his salary when he was placed on involuntary leave of absence.

nicipal official, *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); which is not the case here.

**3.** Ceko premises his due process claims on the Fifth and Fourteenth Amendments to the United States Constitution. To the extent Ceko seeks relief under the Due Process Clause of the Fifth Amendment, his claims must be dismissed. That clause only operates against action taken

by the federal government. *Johnson v. Carroll,* 694 F.Supp. 500, 504 (N.D.Ill.1988). Since Ceko's lawsuit names the City of Chicago and certain City officials as defendants, the Due Process Clause of the Fifth Amendment is inapplicable. In any event, he may assert the same claims under the Due Process Clause of the Fourteenth Amendment. *Id.*

Contrary to defendants' position, such a deprivation arouses due process concerns. "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Roth*, 408 U.S. at 576, 92 S.Ct. at 2708. Having acquired a property interest in his continued employment, Ceko has a legitimate claim of entitlement to the benefits associated with that protected interest—*i.e.*, his salary. *See D'Acquisto*, 640 F.Supp. at 609. The interest in continued employment would be hollow indeed if it did not secure payment, the primary benefit of being employed.

 The basic characteristic of a property interest is the continued flow of benefits, which may not be interrupted without an opportunity to be heard. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *D'Acquisto*, 640 F.Supp. at 609. When the Police Department placed Ceko on involuntary leave of absence without pay, he was deprived of his protected property interest. *Cf. Laurido v. Simon*, 489 F.Supp. 1169, 1177 (S.D.N.Y.1980) ("placing a permanent Civil Service employee on an involuntary leave of absence based on a finding of mental unfitness implicates ... property interests protected under the Due Process Clause of the 14th Amendment"). The next issue, then, is whether Ceko was afforded adequate process in connection with this deprivation. Ceko contends that the Police Department's leave of absence policy does not satisfy the requirements of due process.[4] In evaluating the adequacy of existing procedures, the court must keep in mind that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The court must balance the competing interests of the plaintiff and the government, and the relative strength of those interests. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–43, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). In *Mathews*, the Supreme Court indicated that the scope of due process protection hinges on three factors:

[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] the Government's interest, including the function involved and the fiscal and administrative burdens that the addition-

---

**4.** That policy is embodied in Rule XI, Section 3 of the City of Chicago Personnel Rules, governing civilian Police Department employees. Rule XI, as set forth in defendants' reply memorandum, states as follows:

**Section 3—Involuntary Medical Leave**

Upon good cause shown, a department head, with the approval of the Commissioner of Personnel, may order an employee to report for an examination to determine fitness to perform the essential duties of his or her position. The medical or psychological examiner shall provide the Commissioner of Personnel with a written opinion concerning whether or not the employee is capable of performing the essential duties of his or her position. If the examiner finds the employee is not able to perform the essential duties of his or her position and the Commissioner concurs with this finding, the employee shall be placed on leave of absence without pay and with such disability benefit for which the employee may qualify. The employee placed on leave may use any accumulated sick leave or vacation leave.

An employee placed on involuntary medical leave may request in writing a review of such action by the Commissioner of Personnel after the first year and each year thereafter; and/or an employee placed on involuntary medical leave may request in writing a review by the Commissioner of Personnel at any time the employee submits a written report from a physician indicating that there has been a substantial change in his/her physical or psychological condition which would enable the employee to perform the essential duties of his or her position. This report must specifically address in detail each of the medical findings included in the report submitted to the Commissioner by the examiner for the City; and must state in the affirmative that no additional medical or psychological conditions exist which would prevent the employee from performing the essential duties of his/her position. The Commissioner of Personnel shall determine the nature and extent of the review.

al or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903.

■■■ At a minimum, due process contemplates "some kind of a hearing." *Loudermill*, 470 U.S. at 542, 105 S.Ct. at 1493. But the adequacy of the process does not rest solely on the existence of a hearing; the timing of the hearing is also a critical consideration. *D'Acquisto*, 640 F.Supp. at 612. A hearing, of course, cannot provide a sufficient opportunity to be heard unless it is held at "a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). "To be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided—*i.e.*, either before or immediately after suspension." *Barry v. Barchi*, 443 U.S. 55, 74, 99 S.Ct. 2642, 2654, 61 L.Ed.2d 365 (1979) (Brennan, J., concurring in part). While a presumption should run in favor of conducting the hearing *before* the deprivation of the protected interest, *D'Acquisto*, 640 F.Supp. at 612, the Supreme Court has rejected "the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation of property." *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981) (emphasis in original). Thus, in cases where the government's interest in immediate action outweighs the private interest at issue, postdeprivation procedures do not run afoul of the Constitution. *See, e.g., Mackey v. Montrym*, 443 U.S. 1, 18, 99 S.Ct. 2612, 2621, 61 L.Ed.2d 321 (1979) (in light of the government's substantial interest in maintaining safe public highways, government was not required to conduct a hearing prior to suspending the driver's license of individuals who refuse to take a breath analysis test upon arrest for drunken driving); *Goss v. Lopez*, 419 U.S. 565, 582–83, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975) (dangerous or disruptive students may be suspended by school without a presuspension hearing); *see also Boddie v. Connecticut*, 401 U.S.

371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) (predeprivation hearing not required "where some valid governmental interest is at stake that justifies postponing the hearing until after the event"); *R.A. Holman & Co. v. SEC*, 299 F.2d 127, 131 (D.C.Cir.) ("In a wide variety of situations, it has long been recognized that where harm to the public is threatened, and the private interest infringed is reasonably deemed to be of less importance, an official body can take summary action pending a later hearing."), *cert. denied*, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962).

■■■ In the instant case, Ceko has a very strong interest at stake; the involuntary leave of absence could serve to deprive him of the means to pursue his livelihood. The Police Department, on the other hand, has a vital interest in removing unfit 911 dispatchers quickly and without undue burden. By its very nature, the position of 911 dispatcher involves emergency situations requiring the mental capacity to react under pressure. An individual who is incapable of working quickly and effectively under such conditions could pose a severe threat to public safety.

Considering both the private and governmental interests involved, this court concludes that the Police Department was not required to conduct a hearing prior to placing Ceko on a medical leave of absence. The Police Department's interest in immediate action takes precedence over Ceko's due process interest. Given the emotional and psychological demands of the 911 position, the Police Department must have ability to quickly remove 911 personnel who appear to be mentally unstable. *Cf. D'Acquisto*, 640 F.Supp. at 613 (government interest in effective law enforcement justifies suspending untrustworthy or ineffective police officers without a prior hearing). In *Newman v. Board of Education*, 594 F.2d 299 (2d Cir.1979), the Second Circuit addressed similar concerns. That case involved a tenured high school teacher who was placed on unpaid leave of absence due to mental instability. *Id.* at 300–01. Concluding that the plaintiff was not entitled

to a prior adversarial hearing, the court stated:

> [T]he risk of harm that might occur if a teacher believed to be mentally unfit were permitted to continue teaching is too great to insist on retention while the issue of mental fitness is being resolved. The situation is one where the teacher's due process interest should be satisfiable through post-suspension procedures.

*Id.* at 304. The need for immediacy in this case, as in *Newman,* is substantial. The Police Department's interest in ensuring the immediate safety of the public outweighs Ceko's due process interest in a prior hearing.

Before going on sick leave, Ceko received all the process to which he was entitled. Under the Police Department's leave of absence policy, the Police Department may order an employee to submit to an examination to determine whether the employee is fit to perform his job duties—as long as there is sufficient cause to require the examination. *See supra* note 4. If the examiner determines that the employee is not capable of performing his duties, and the Police Department concurs, the employee is placed on leave of absence without pay. When Ceko was hospitalized for treatment of his psychological illness, the Police Department certainly had enough cause to require him to submit to a medical examination. After conducting an examination, Dr. Stanard concluded that Ceko was suffering from "schizophrenia," a type of psychological disorder that could not be cured by medication or therapy over the short term. Dr. Stanard advised the Police Department that Ceko "should not work in jobs involving public safety"—especially a job "that would require that he directly interact in emergencies or conflict situations." In Dr. Stanard's opinion, Ceko "is definitely unfit to be a 911 dispatcher, a dispatcher's aide or a police officer." Based on Ceko's past history of psychological illness, and Dr. Stanard's medical findings, the Police Department had reason to question Ceko's capacity to function as a 911 dispatcher. Consequently, the Police Department was not required to postpone placing Ceko on leave of absence pending a hearing on his mental fitness; the opinion of Dr. Stanard combined with Ceko's medical history was sufficient to satisfy constitutional standards. *See Barry,* 443 U.S. at 65, 99 S.Ct. at 2649; *Strong v. Board. of Educ.,* 902 F.2d 208, 212 (2d Cir.) ("an important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted may justify postponing the opportunity to be heard until after the initial deprivation"), *cert. denied,* —— U.S. ——, 111 S.Ct. 250, 112 L.Ed.2d 208 (1990).

■ Although the Police Department's leave policy, as applied to Ceko, does not violate the Constitution by failing to provide a predeprivation hearing, Ceko was entitled to a prompt resolution of the matter following the Police Department's decision to place him on unpaid medical leave. In situations where the government's interest in swift action overrides the individual's interest in a predeprivation hearing, the government must conduct a *prompt* post-deprivation hearing. *Mackey,* 443 U.S. at 19, 99 S.Ct. at 2621; *Barry,* 443 U.S. at 66, 99 S.Ct. at 2650. The procedures involved in this case, however, do not guarantee Police Department employees a prompt hearing. In fact, the leave of absence policy utilized by the Police Department does not indicate that a hearing will be provided at a specific time following the deprivation of an employee's property interest. The relevant portion of the Police Department's leave of absence policy states as follows:

> An employee placed on involuntary medical leave may request in writing a review of such action by the Commissioner of Personnel after the first year and each year thereafter; and/or an employee placed on involuntary medical leave may request in writing a review by the Commissioner of Personnel at any time the employee submits a written report from a physician indicating that there has been a substantial change in his/her physical or psychological condition which would enable the employee to perform the essential duties of his or her position.... *The Commissioner of Person-.*

*nel shall determine the nature and extent of the review.*

(Emphasis added.) Apparently, the Commissioner of Personnel has the discretion to determine the timing and scope of the requested review. Nowhere in this policy is the employee assured of a prompt postdeprivation hearing to fully determine the appropriateness of an extended unpaid leave of absence. For this reason, the Police Department's leave of absence policy is constitutionally infirm. *See Barry,* 443 U.S. at 66, 99 S.Ct. at 2650.

■■■■ A prompt hearing is necessary to minimize the risk of an erroneous decision—especially when the Police Department is making its decision on the opinion of a single doctor. As the court in *Snead v. Department of Social Services,* 355 F.Supp. 764, 772 (S.D.N.Y.1973), aptly noted: "Our jurisprudence does not recognize the opinion of any individual expert as infallible; professional judgments concerning mental fitness are just as likely to differ as the observations of layman regarding simple issues of fact." Diagnosing psychological disorders is not an exact science, as demonstrated by this case. The conclusions of Dr. Stanard were contradicted by Ceko's treating physician, who determined that Ceko was able to resume his position as a 911 dispatcher. Yet, there is no evidence that the Police Department gave this medical evidence any serious consideration. It is not enough that Ceko may be allowed to present medical evidence at some unspecified time in the future. Ceko is entitled to a prompt hearing, while the opportunity to minimize his injury is still present.

This court sees no reason why Ceko should be prevented from challenging the Police Department's decision to place him on unpaid medical leave of absence. The Police Department has not demonstrated that it would suffer undue burden or expense in conducting a postdeprivation hearing. After initially placing an employee on medical leave, the City has no real interest in delaying a review of the employee's capacity to work.

The scope of review need not be elaborate, but it must ensure that the determination of mental fitness is reached with accuracy and fairness. While some sort of prompt postdeprivation hearing is necessary, this court will not prescribe the form it should take; that decision is better left to the City. Since existing procedures do not provide for a timely opportunity to contest the initial medical findings relied upon by the Police Department, Ceko was deprived of his right to due process under the Fourteenth Amendment. Therefore, defendants' motion to dismiss Count I of Ceko's complaint is denied.

### B. Count II—Liberty Interest

In Count II, Ceko alleges that he has a liberty interest in his "good name and employment prospects." *Verified Complaint,* ¶ 35. Ceko further alleges that defendants deprived him of this interest by placing Dr. Stanard's medical evaluation in his personnel file, which is allegedly open for review by prospective employers. In light of the unfavorable medical findings contained in Dr. Stanard's evaluation, Ceko concludes that he is virtually unemployable.

■■■■ The Supreme Court has recognized a constitutionally-protected liberty interest in one's "standing and associations in his community." *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. When the government jeopardizes an individual's "good name, reputation, honor, or integrity," or imposes "a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities," the individual is entitled to notice and an opportunity to be heard. *Id.; Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). In the absence of some publication of the allegedly damaging information, however, the plaintiff cannot establish a deprivation of his liberty interest. *Board of Curators v. Horowitz,* 435 U.S. 78, 83–84, 98 S.Ct. 948, 951–52, 55 L.Ed.2d 124 (1978); *Bishop,* 426 U.S. at 348, 96 S.Ct. at 2079.

■■■■ Several courts have already held that a charge of mental unfitness, if unjustified, imposes the kind of stigma that affects employability. *See, e.g., Lombard v. Board of Educ.,* 502 F.2d 631, 637–38 (2d Cir.1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975); *Lenihan*

*v. City of New York,* 636 F.Supp. 998, 1018 (S.D.N.Y.1985). A medical finding of mental instability may foreclose or substantially curtail other employment opportunities by fostering doubts in the mind of prospective employers as to the plaintiff's capacity to function capably in an employment situation. Although defendants do not contest the viability of Ceko's asserted liberty interest, they contend that Ceko was not deprived of this interest because Dr. Stanard's medical findings were never made public. According to defendants, the charges of mental unfitness were not publicized beyond the chain of command in the Police Department.

In this court's view, the Police Department did not create a barrier to future employment by placing the allegedly stigmatizing information in Ceko's personnel file. *See Clark v. Maurer,* 824 F.2d 565, 567 (7th Cir.1987); *Ratliff v. City of Milwaukee,* 795 F.2d 612, 627 (7th Cir.1986). Ceko's allegation to the contrary, standing alone, is insufficient to establish a deprivation of his liberty interest. Ceko attempts to demonstrate that the information was sufficiently publicized when it was forwarded to his pension fund in connection with his application for disability benefits. Even if his medical file was forwarded to the pension fund as alleged, defendants conduct does not rise to the level of a constitutional deprivation. There are no allegations that Ceko's files have been made available to prospective employers or that the information was otherwise disseminated in the community. Absent such publicizing, Ceko cannot establish that defendants' conduct impacted upon his ability to seek other employment. Accordingly, Count II is dismissed.

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is denied with respect to Count I of plaintiff's complaint, and granted with respect to Count II.

IT IS SO ORDERED.